1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    JONEE FONSECA,                        No.  2:16-cv-00889-KJM-EFB

12                   Plaintiff,

13         v.                               ORDER

14    KAISER PERMANENTE MEDICAL
      CENTER ROSEVILLE, et al.,
15
                     Defendants.
16

17

18            Approximately one month ago, doctors at a Kaiser Permanente hospital in

19    Roseville, California determined that two-year-old Israel Stinson had suffered the irreversible

20    cessation of all functions of his entire brain, including the brain stem.  Under California law, this

21    determination means Israel has suffered brain death and is no longer alive.  But because Israel's

22    heart is still beating and he is still breathing, with the support of a ventilator and careful, ongoing

23    medical intervention, Israel's mother, Jonee Fonseca, asks this court to prohibit Kaiser from

24    ending its life-support efforts.  She argues California's definition of "death" violates the United

25    States Constitution and deprives both her and Israel of due process.  She also claims the

26    defendants' actions have violated the California Constitution and the federal Emergency

27    Treatment and Active Labor Act.  She names Kaiser, one of its physicians, and the Director of the

28    California Department of Health as defendants, and she requests a preliminary injunction to

                                          1

1    maintain and improve Israel's condition during this lawsuit.  Although Kaiser and Ms. Fonseca

2    have been attempting to reach a mediated resolution to accomplish Ms. Fonseca's goal of

3    transporting Israel to a different location, there currently is no concrete proposal identifying either

4    a location that will receive Israel or a method of transport.  The court therefore is called to resolve

5    the parties' legal disputes.

6            To this end, the court held a hearing on the preliminary injunction request on May

7    11, 2016.  Kevin Snider, Matthew McReynolds, and Alexandra Snyder appeared for Ms. Fonseca,

8    and Jason Curliano appeared for Kaiser and Michael Myette, M.D.  Ashante Norton and Ismael

9    Castro appeared and observed on behalf of Karen Smith, M.D., the Director of California's

10   Department of Public Health.

11   I.      DETAILED BACKGROUND

12           On April 1, 2016, Ms. Fonseca took Israel to a local emergency room.  Fonseca

13   Decl. ¶ 1, ECF No. 3-2.  He had displayed symptoms of an asthma attack.  *Id.*  He was transferred

14   to the pediatric unit at the hospital for the University of California, Davis, and his condition

15   stabilized at least somewhat.  *Id.* ¶¶ 1–2.  Later the same day, however, after arriving at U.C.

16   Davis, his condition worsened, he went into cardiac arrest, and he fell unconscious.  *See id.*

17   ¶¶ 3-5.  Doctors attempted to revive him, and then used an extracorporeal membrane oxygenation

18   (ECMO) machine to provide cardiac and respiratory support.  *Id.* ¶¶ 5–7.  Within a few days, his

19   heart and lungs were functioning again on their own, but he requires a ventilator to breathe.  *See*

20   *id.* ¶¶ 9–14.  A doctor determined Israel had suffered brain death; he was therefore no longer alive

21   within the meaning of the California Uniform Determination of Death Act (CUDDA), Cal. Health

22   & Safety Code § 7180 *et seq.*[1]  *See id.* ¶ 14; First Am. Compl. ¶¶ 14, 19, ECF No. 1.  Israel was

23   then transported to the Kaiser hospital in Roseville, where he has been attended to since April 11,

---

[1] *See* Cal. Health & Safety Code § 7180(a) ("An individual who has sustained either
(1) irreversible cessation of circulatory and respiratory functions, or (2) irreversible cessation of
all functions of the entire brain, including the brain stem, is dead.  A determination of death must
be made in accordance with accepted medical standards."); *see also id.* § 7181 ("When an
individual is pronounced dead by determining that the individual has sustained an irreversible
cessation of all functions of the entire brain, including the brain stem, there shall be independent
confirmation by another physician.").

2016.  Doctors at Kaiser have twice independently confirmed he is brain dead.  Fonseca Decl. ¶ 13; *see also* Myette Decl., ECF No. 43-1.  The hospital completed its portion of a death certificate, which identifies the date of Israel's death as April 14, 2016, but other portions of the certificate remain incomplete.  *See* Myette Decl. Ex. B, ECF No. 43-3 (incomplete portions include parents' names and information about the disposition).  In light of its doctors' determinations, Kaiser intends to end life support efforts.

Ms. Fonseca believes Israel is not dead because his heart is beating and he is breathing, but if he no longer receives life support, he will then die.  First Am. Compl. ¶ 3.  She perceives that he responds to her voice and touch, and at times he appears to have taken breaths on his own.  *See* Fonseca Decl., ECF No. 35.  She therefore feels an imperative moral and spiritual obligation to ensure life support efforts for her son do not end.  *Id*. ¶ 62.

Dr. Michael Myette, M.D. is the Medical Director for the Pediatric Intensive Care Unit at Kaiser in Roseville, the doctor ultimately responsible for Israel's care, and a defendant in this action.  He explains his understanding of Israel's condition in basic terms:  "Israel's brain is not telling his organs how to function."  Myette Decl. ¶ 5.  This means doctors must meticulously monitor and support his condition by adjusting his blood pressure and hormone levels pharmaceutically, providing support with a ventilator, and keeping his body warm with blankets.  *Id.* ¶¶ 5–7.  He is receiving only dextrose—sugar—for nutrition, but has not lost weight over the three to four weeks since he was admitted.  *Id.* ¶ 9.  Dr. Myette worries that if he fed Israel internally, complications would likely arise, including infection, which would be difficult to detect and combat.  *Id.* ¶ 8.  Israel does not respond to any stimulus.  *Id.* ¶¶ 10, 12.  Dr. Myette opines that although Ms. Fonseca believes Israel has taken breaths on his own, this is a misreading of the ventilator, which can be artificially triggered.  *Id.* ¶ 14.  The movements Israel makes in response to his mother's touch or voice are reflexes that originate in his spine; they also are triggered by more innocuous and lighter contact, for example, a bump on the side of his bed.  *Id.* ¶¶ 10–12.

On April 14, 2016, after Kaiser completed its portion of the death certificate, Ms. Fonseca sought relief from the Placer County Superior Court on Israel's behalf.  *See Fonseca*

1    ex rel. *Stinson v. U.C. Davis Children's Hosp*., No. S-CV-0037673 (Placer Cty. Super. Ct. filed

2    Apr. 14, 2016).[2]  The superior court entered a temporary restraining order (TRO) requiring Kaiser

3    to continue life support, and over a period of about two weeks during which the order was

4    extended twice, Ms. Fonseca and Israel's biological father, Nathaniel Stinson, attempted

5    unsuccessfully to arrange for Israel's transfer to another medical facility.  *See generally* Curliano

6    Decl. Exs. A–G, J–K, ECF No. 14-2 to -8 & -11 to -12.  On April 29, the state court dismissed

7    Ms. Fonseca's petition for relief and dissolved the TRO.  ECF No. 19-1.  The state court found

8    California Health and Safety Code sections 7180 and 7181 had "been complied with."  *Id.* at 2.

9            On April 28, 2016, the day before the Superior Court's restraining order was set to

10   finally expire, Ms. Fonseca filed this lawsuit.  *See* Compl., ECF No. 1.  Her original complaint

11   alleged claims directly under the U.S. Constitution, the federal Rehabilitation Act, and the

12   Americans with Disabilities Act.  The court granted a temporary restraining order until a hearing

13   could be held on Monday, May 2, 2016.  ECF No. 9.  At the May 2 hearing, the court dismissed

14   the original complaint by bench order, as the complaint's allegations did not show the court had

15   jurisdiction.  Minutes, ECF No. 22; Minute Order, ECF No. 23.  The court ordered Ms. Fonseca

16   to file a first amended complaint the next day.  Kaiser did not object to an extension of the TRO

17   through May 11, and a hearing was set for that day on a motion for a fully briefed preliminary

18   injunction.  The matter was also referred to emergency mediation before a magistrate judge of

19   this court, but as noted the parties have been unable to reach an agreement so as to moot the

20   current motion.  Minutes, ECF No. 28.

21           Ms. Fonseca timely filed a first amended complaint, which includes five claims.

22   First, she claims under 42 U.S.C. § 1983 that CUDDA is unconstitutional on its face under the

23   Fifth and Fourteenth Amendments.  First Am. Compl. ¶¶ 51–59.  CUDDA provides that "death"

24   is not just the cessation of breath and a heartbeat—the prior, historical conception—but also the

25   absence of all functions of the brain and brain stem.  *Id.* ¶ 56.  Because the CUDDA provision is

26

27           [2] The court may take judicial notice of the filings in the state case.  *See* Fed. R. Evid.
     201(b) (governing judicial notice); *Asdar Grp. v. Pillsbury, Madison & Sutro*, 99 F.3d 289, 290
28   n.1 (9th Cir. 1996) (court filings and orders in related litigation may be subject to judicial notice).

broader than the historical conception and because it allows for no specific appeal of a death determination, Ms. Fonseca alleges it deprives Israel of due process. *Id.* ¶¶ 56–57. She asserts this claim against all the defendants: Kaiser, Dr. Myette, and Dr. Smith. *See id.* ¶¶ 5–6. Ms. Fonseca asks the court to declare CUDDA unconstitutional on its face, *id.* ¶ 59, and requests Kaiser be ordered to take certain steps to maintain and improve Israel's condition, *id.* ¶¶ 47–50.

Second, Ms. Fonseca alleges under 42 U.S.C. § 1983 that CUDDA deprives her of due process as Israel's parent. *Id.* ¶¶ 60–67. For this independent reason, she claims CUDDA is unconstitutional on its face. *Id.* ¶ 67. She alleges this claim against all the defendants.

Third, Ms. Fonseca alleges Kaiser violated the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd *et seq.* First Am. Compl. ¶¶ 68–79. Under EMTALA, hospitals with emergency departments must perform appropriate medical screening to determine whether those who come to the hospital asking for treatment have an emergency medical condition. 42 U.S.C. § 1395dd(a). If the hospital discovers a medical emergency, it must examine, treat, and "stabilize" the patient's condition or, alternatively, transfer the person to another medical facility. *See id.* § 1395dd(b), (e). Ms. Fonseca alleges Kaiser has not and will not appropriately stabilize Israel's condition if it removes life support, and she alleges Kaiser has not otherwise made an appropriate effort to transfer Israel to another facility. First Am. Compl. ¶¶ 71–75. She asks for declaratory relief, money damages, and an injunction ordering Kaiser to comply with EMTALA and stabilize Israel's condition. *Id.* ¶¶ 77–79.

Fourth, Ms. Fonseca alleges under 42 U.S.C. § 1983 that Kaiser and Dr. Myette have deprived her and Israel of their rights to privacy under the Fourth Amendment. *Id.* ¶¶ 80-84. She refers specifically to her right and Israel's right to have control over Israel's healthcare.

Fifth, Ms. Fonseca alleges Kaiser and Dr. Myette have violated her right and Israel's right to privacy and autonomy under Article I of the California Constitution. *Id.* ¶¶ 85-88.

Ms. Fonseca's motion for a preliminary injunction was filed on May 6, 2016. *See* Mot. Prelim. Inj., ECF No. 33. She requests relief at this stage on the basis of her claims under the EMTALA and federal Constitution, but not under her California constitutional claim. Kaiser

5

1   and Dr. Myette filed an opposition on May 10, 2016, ECF No. 43, and the court allowed reply

2   argument at the hearing on May 11, 2016.

3   II.      JURISDICTION

4          Federal courts are courts of limited jurisdiction.  Therefore, as in every case, the

5   court first asks whether it has jurisdiction to hear and decide the dispute before it.  As explained

6   below, the court is satisfied it has jurisdiction over the claims and defendants, although federal

7   question jurisdiction does not adhere to Kaiser and Dr. Myette based on the civil rights claims.

8          A.      Rooker-Feldman

9          As a preliminary matter, in the May 2 hearing, the court voiced its concern that it

10   lacks jurisdiction over this action under *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and

11   *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983), two cases that form the

12   basis of what courts call the *Rooker-Feldman* doctrine.  On further review and in light of the

13   allegations in the First Amended Complaint, the court is satisfied this doctrine does not deprive it

14   of all jurisdiction over this case.

15          Under the *Rooker-Feldman* doctrine, federal district courts are without jurisdiction

16   to hear direct and de facto appeals from the judgments of state courts.  *Cooper v. Ramos*,

17   704 F.3d 772, 777 (9th Cir. 2012); *Noel v. Hall*, 341 F.3d 1148, 1155 (9th Cir. 2003).  To

18   determine whether an action functions as a de facto appeal, the court "pay[s] close attention to the

19   relief sought by the federal-court plaintiff."  *Id.* at 777–78 (quoting *Bianchi v. Rylaarsdam*,

20   334 F.3d 895, 900 (9th Cir. 2003)) (emphasis omitted).  "It is a forbidden de facto appeal under

21   *Rooker–Feldman* when the plaintiff in federal district court complains of a legal wrong allegedly

22   committed by the state court, and seeks relief from the judgment of that court."  *Id.* (quoting *Noel*,

23   341 F.3d at 1163).  However, the *Rooker-Feldman* doctrine does not preclude a plaintiff from

24   bringing an "independent claim" that, though raising similar or even identical to issues, was not

25   the subject of a previous judgment by the state court.  *Id.* at 778.

26          A review of *Feldman* itself is instructive here.  In *Feldman*, two graduates of

27   unaccredited law schools petitioned a local court for a waiver to permit them to sit for the bar.

28   460 U.S. at 466.  After the local court rejected their claims, the graduates filed suit in federal

1    court.  *Id.* at 468.  The Supreme Court deemed the action a de facto appeal to the extent it sought

2    review of the local court's denial.  *Id.* at 482.  On the other hand, as recounted by the Ninth

3    Circuit in *Noel*, the Supreme Court allowed the "challenge to the local court's legislative act of

4    promulgating its rule" prohibiting the graduates from sitting for the bar.  *Noel*, 341 F.3d at 1157.

5    This aspect of the lawsuit "was a challenge to the validity of the rule rather than a challenge to an

6    application of the rule."  *Id.*; *see also Feldman*, 460 U.S. at 487.

7            In some instances, the independent constitutional claims a plaintiff asserts in

8    federal court may not be possible to disentangle from a state court's earlier decision.  *See*

9    *Feldman*, 460 U.S. at 482 n.16.  If that is the case, then the federal district court may not review

10   the state court decision.  *Id.*  This was true of only some of the claims before the *Feldman* Court;

11   other claims could be separated from the de facto appeal, for example the graduates' claims that

12   the District of Columbia's law-school requirement discriminated against them and impermissibly

13   delegated authority to the American Bar Association to regulate the bar.  *Id.* at 487–88.

14           Here, Ms. Fonseca challenges CUDDA's constitutionality generally.  For the most

15   part, she does not challenge CUDDA's particular application.  *See* Mot. Prelim. Inj. at 12 ("At

16   this stage of the proceedings, Plaintiff is not asserting that [Kaiser] has misread or misapplied

17   CUDDA."); *but see*, *e.g.*, First Am. Compl. ¶ 32; Byrne Decl. ¶¶ 5, 12–15, ECF No. 36.  Her

18   constitutional claims here were not presented to the state superior court and except for the

19   mandatory aspects of the injunction she proposes, discussed toward the end of this order, the

20   relief she now seeks does not undermine the factual or legal conclusions the state court reached.

21   The same is true of her non-constitutional claims; none was before the superior court.

22   Ms. Fonseca neither asserts legal error by the state court nor seeks relief from a state court

23   judgment.  If Ms. Fonseca can otherwise establish this court's subject matter jurisdiction over her

24   claims, the *Rooker–Feldman* doctrine does not prevent her case from going forward.

25   /////

26   /////

27   /////

28   /////

7

1          B.      Standing

2                  Next is the question of standing.  Given Ms. Fonseca's status as Israel's mother

3     and general guardian, she may litigate here on his behalf.  *See* Fed. R. Civ. P. 17(c) (a general

4     guardian may sue on behalf of a minor or incompetent person); *Doe* ex rel. *Sisco v. Weed Union*

5     *Elementary Sch. Dist.*, No. 13-01145, 2013 WL 2666024, at *1 (E.D. Cal. June 12, 2013) ("Rule

6     17(c)(1)(A) permits a 'general guardian' to sue in federal court on behalf of a minor, and a parent

7     is a guardian who may so sue." (citation and quotation marks omitted)).  This presupposes that

8     the rules of parental guardianship govern equally the relationship between a parent and a child

9     whose death is disputed.  Whatever the correct procedural method of representation, for purposes

10    of this motion Ms. Fonseca may represent Israel's interests in this case.  *See, e.g.*, *Lopez v. Cty. of*

11    *L.A.*, No. 15-01745, 2015 WL 3913263, at *9 (C.D. Cal. June 25, 2015) (survival claims under

12    Constitution by parent); *see also Williams v. Bradshaw*, 459 F.3d 846, 848 (8th Cir. 2006)

13    ("Federal courts are to apply state law in deciding who may bring a § 1983 action on a decedent's

14    behalf.");  Cal. Civ. Proc. Code § 377.10, .20, .30 (governing survival claims);  Cal. Prob. Code

15    §§ 6401–02 (who may bring a survival action).  She has standing.  Her request to be appointed as

16    Israel's guardian *ad litem* is therefore denied as moot.  *See* Pet., ECF No. 31.

17         C.      Federal Question Jurisdiction and Action Under Color of Law

18                 Turning now to the complaint's substantive claims, Ms. Fonseca proposes three

19    jurisdictional pillars to support her action in federal court.

20                 1.      EMTALA and § 1331

21                 First, she cites her EMTALA claims and 28 U.S.C. § 1331, the latter of which

22    establishes this court's jurisdiction over all claims arising under the Constitution, laws, and

23    treaties of the United States.  This court's jurisdiction to evaluate her EMTALA claim, which

24    arises under a federal statute, is beyond dispute, as is this court's supplemental jurisdiction to

25    consider any state-law claims that are a part of the same case or controversy.  *See* 28 U.S.C.

26    § 1367(a).

27

28

                                                            8

1

      2.    <u>42 U.S.C. § 1983</u>

2

      This leaves Ms. Fonseca's claims under § 1983, a broad federal civil rights statute.

3

Any claim under that section must concern the defendants' actions under color of law.  *Lugar v.*

4

*Edmondson Oil Co.*, 457 U.S. 922, 946 (1982).  State action is a "jurisdictional requisite" in any

5

claim under § 1983.  *Polk Cty. v. Dodson*, 454 U.S. 312, 315 (1981).  In this regard, Ms. Fonseca

6

notes her addition of Dr. Smith as a defendant.  Dr. Smith is alleged to be the Director of the

7

California Department of Public Health and is sued in her official capacity under 42 U.S.C.

8

§ 1983.  First Am. Compl. ¶ 6.

9

      a.  Dr. Smith

10

      "Claims under § 1983 are limited by the scope of the Eleventh Amendment."[3]

11

*Doe v. Lawrence Livermore Nat. Lab.*, 131 F.3d 836, 839 (9th Cir. 1997).  Specifically, states and

12

state governmental entities are not "persons" within the meaning of § 1983.  *Will v. Michigan*

13

*Dep't of State Police*, 491 U.S. 58, 70 (1989).  The Supreme Court has, however, interpreted the

14

Eleventh Amendment as allowing federal courts to grant prospective injunctive relief against state

15

officials acting "under color of law."  *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247,

16

255 (2011); *Ex parte Young*, 209 U.S. 123, 159–60 (1908).  In short, "the Eleventh Amendment

17

does not generally bar declaratory judgment actions against state officers."  *Nat'l Audubon Soc'y,*

18

*Inc. v. Davis*, 307 F.3d 835, 847 (9th Cir. 2002), *opinion amended on denial of reh'g*, 312 F.3d

19

416 (2002).  This court therefore has jurisdiction to consider Ms. Fonseca's request for

20

prospective declaratory relief against Dr. Smith, which targets an allegedly ongoing violation of

21

federal constitutional law in the form of her application of CUDDA in the provision of procedures

22

related to issuance of death certificates.

23

      b.  Kaiser and Dr. Myette

24

      Kaiser and Dr. Myette, by contrast, have not in any way supported by the record

25

acted "under color of law."  Kaiser is a private hospital, and Dr. Myette is a private person.

26

27

      [3] "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another

28

state, or by citizens or subjects of any foreign state."  U.S. Const. amend. XI.

1    "[P]rivate parties are not generally acting under color of state law," *Price v. State of Haw.*,

2    939 F.2d 702, 707–08 (9th Cir. 1991), "no matter how discriminatory or wrongful" their actions

3    may be, *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (citation and quotation marks

4    omitted).  But "[u]nder familiar principals, even a private entity can, in certain circumstances, be

5    subject to liability under section 1983."  *Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950,

6    954 (9th Cir. 2008) (en banc).  The basic question a court must answer is whether the private

7    person's conduct "may be fairly characterized as 'state action'" or "fairly attributable to the

8    State."  *Lugar*, 457 U.S. at 924, 937.  The phrase "under color of law" for purposes of a § 1983

9    claim has the same meaning as the phrase "state action" for purposes of the Fourteenth

10   Amendment.  *Id.* at 928.

11          At the outset, the Supreme Court has taken care to distinguish two related elements

12   of "fair attribution" in a § 1983 claim: the plaintiff must show both that a "state action" has

13   occurred and that the defendants acted "under color of law."  *Id.* at 937; *Flagg Bros., Inc. v.*

14   *Brooks*, 436 U.S. 149, 156 (1978).  Here, a state has acted: California passed CUDDA, and the

15   California Department of Public Health imposes procedural requirements related to the issuance

16   of a death certificate, including for people who have suffered brain death under CUDDA.  *See*

17   First Am. Compl. ¶¶ 6, 21; *see also Am. Mfrs.*, 526 U.S. at 50 (a private person's actions "with

18   the knowledge of and pursuant to" a statute shows "state action" occurred (citation and quotation

19   marks omitted)).  But these facts do not establish Kaiser's and Dr. Myette's action under color of

20   law.

21          Federal courts have often been called on to decide whether doctors and hospitals

22   have acted under color of law.  In general, private doctors and hospitals are more commonly

23   found not to be state actors.  *See, e.g.*, *Babchuk v. Indiana Univ. Health, Inc.*, 809 F.3d 966,

24   970-71 (7th Cir. 2016); *McGugan v. Aldana-Bernier*, 752 F.3d 224, 229–31 (2d Cir. 2014), *cert.*

25   *denied*, 135 S. Ct. 1703 (2015); *Wittner v. Banner Health*, 720 F.3d 770, 775–81 (10th Cir. 2013);

26   *Briley v. State of Cal.*, 564 F.2d 849, 855–56 (9th Cir. 1977) (noting that "private hospitals and

27   physicians have consistently been dismissed from § 1983 actions for failing to come within the

28

10

color of state law requirement of this section" and collecting authority).[4]  This is likely the result of two rules of thumb.  First, the Supreme Court has "consistently held that '[t]he mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment." *Am. Mfrs.*, 526 U.S. at 52 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 350 (1974), and citing *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)) (alteration in original).  On a related note, even though doctors' services are "affected with a public interest," the same may be said of many professions, and this does not automatically convert their every action into an action of the state.  *See Jackson*, 419 U.S. at 354.  Second, although doctors and hospitals are often the beneficiaries of state and federal funding, receipt of government funding alone does not make for action under color of law.  *See Chudacoff v. Univ. Med. Ctr. of S. Nev.*, 649 F.3d 1143, 1149–50 (9th Cir. 2011) (collecting authority).

In addition, the choices a doctor or a hospital must make are often matters of discretion, informed by expertise, training, and the specifics of the patient presented to them, and for this reason, courts often hesitate to find a doctor's actions fairly attributable to the state.  *See, e.g.*, *Blum*, 457 U.S. at 1008 (decisions that "ultimately turn on medical judgments made by private parties according to professional standards that are not established by the State" undercut claims of action under color of law); *Collyer v. Darling*, 98 F.3d 211, 232–33 (6th Cir. 1996) (noting the absence of any contractual relationship between the doctors and the state and the "independence with which the doctors completed their tasks"); *Pinhas v. Summit Health, Ltd.*, 894 F.2d 1024, 1034 (9th Cir. 1989) (a decision that "ultimately turned on the judgments made by private parties according to professional standards that are not established by the State," but flowed from a peer-review process created by statute, was not an action under color of law), *aff'd on unrelated question*, 500 U.S. 322 (1991).

At the same time, no categorical rule prevents the mixture of professional judgment and action under the color of law.  *See, e.g.*, *West v. Atkins*, 487 U.S. 42, 51 (1988)

---

[4] Kaiser previously has been found by another district court not to be a state actor, in a case challenging California's statutory scheme governing medical peer review proceedings.  *See generally Safari v. Kaiser Found. Health Plan*, No. 11-05371, 2012 WL 1669351 (N.D. Cal. May 11, 2012).

1  (explaining the court below misread Supreme Court precedent "as establishing the general

2  principle that professionals do not act under color of state law when they act in their professional

3  capacities").  Nevertheless, private doctors and hospitals do not even act under color of state law

4  when they participate in the civil commitment of mentally ill patients.  *See, e.g.*, *Bass v.*

5  *Parkwood Hosp.*, 180 F.3d 234, 243 (5th Cir. 1999) (collecting authority).

6          By contrast, a doctor or hospital is much more likely to have acted under color of

7  law when the hospital is a public hospital, or if it assumed that role for all practical purposes, for

8  example when a doctor contracts with a state to provide medical services to the inmates of a state

9  prison.  *See generally West*, 487 U.S. 42; *see also Chudacoff*, 649 F.3d at 1150 (citing, *inter alia*,

10  *Woodbury v. McKinnon*, 447 F.2d 839, 842 (5th Cir. 1971)).  In these situations, the doctor or

11  hospital has "exercised power possessed by virtue of state law and made possible only because

12  the wrongdoer is clothed with the authority of state law."  *West*, 487 U.S. at 49 (citation and

13  quotation marks omitted).

14          The Ninth Circuit case of *Sutton v. Providence St. Joseph Medical Center*,

15  192 F.3d 826 (9th Cir. 1999), provides a helpful framework.  In *Sutton*, the Circuit considered in

16  detail the potential liability of a private defendant under § 1983.  It concluded "the mere fact that

17  the government compelled a result does not suggest that the government's action is "fairly

18  attributable" to the private defendant.  *Id.* at 838.  To find otherwise "would be to convert every

19  employer—whether it has one employee or 1,000 employees—into a governmental actor every

20  time it complies with a presumptively valid, generally applicable law, such as an environmental

21  standard or a tax-withholding scheme."  *Id.*  The court emphasized the importance of "something

22  more" between the state and private person:  Did the defendant perform a public function?  Did

23  the government and defendants act together?  Did the government compel or coerce the

24  defendants?  Or is there some other "nexus" between the government and the defendants?  *See id.*

25  at 835.  The Circuit cited three cases as examples of this nexus: (1) *Adickes v. S.H. Kress & Co.*,

26  398 U.S. 144 (1970), where the Supreme Court relied on an alleged conspiracy between private

27  and public actors; (2) *Lugar*, 457 U.S. 922, where the Court relied on official cooperation

28  between the private and public actors; and (3) *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163

1   (1972), where the Court relied on the state's enforcement and ratification of the private person's

2   actions. *See Sutton*, 192 F.3d at 839–41.

3          Here, Ms. Fonseca cites four facts to argue Kaiser's and Dr. Myette's

4   determination of death is fairly attributable to the state: (1) "declarations of death are essentially a

5   state-prescribed function"; (2) the defendants acted as "willful participants" in the State's

6   determination of death; (3) the defendants had "no discretion to entertain independent medical

7   judgment inconsistent with CUDDA's definition" and participated in a specific, state-defined

8   protocol; and (4) Kaiser received Israel from one public institution, U.C. Davis, and is attempting

9   to transfer him to another public official, the coroner. *See* Mot. Prelim. Inj. at 6–9.

10          These facts do not show Kaiser and Dr. Myette are state actors. Several relate to

11   the question of whether a "state action" occurred, but not whether the defendants here acted

12   "under color of law." In other words, it may be that a state normally prescribes the exact criteria

13   for a doctor to check when deciding whether a patient is living, and it may be that Kaiser and Dr.

14   Myette willfully complied with state laws and regulations, but these facts suggest only that a

15   "state action" has occurred, not that Kaiser and Dr. Myette acted under color of law.

16          At most it can be said that California passed a law and that the defendants willfully

17   complied with the law. *See, e.g.*, Cal. Health & Safety Code §§ 102800, 102825 (physicians'

18   obligations related to a death certificate). As *Sutter* teaches, state compulsion does not establish a

19   private defendant's actions under color of law; "something more" is necessary. *Sutton*, 192 F.3d

20   at 835. If the facts here were enough to show Kaiser and Dr. Myette had acted under color of

21   law, then a private person would act under color of law every time he or she obeyed laws or

22   regulations of his or her own accord, which cannot be. *See Am. Mfrs.*, 526 U.S. at 52. Consider a

23   lawyer who studies the California Code of Civil Procedure, or a driver who fills out the

24   paperwork to apply for a driver's license. California defines its rules of procedure and a state

25   agency creates the forms the driver fills out, but the lawyer is not a state actor when he follows

26   the rules, and a driver is not a state actor when he fills out and turns in the form. Something more

27   is required. The defendants suggest an analogy to a priest who completes a marriage license,

28

13

1   Opp'n at 1, which, though unsupported by citation to a specific authority, illustrates the same

2   point.

3            The fact that Kaiser received and would transfer Israel to and from a state

4   institution does not show the private defendants acted under color of law.  It is a coincidence that

5   Israel was transferred from a university hospital, and the presence of state entities in this respect

6   cannot make for action under color of law.

7            Professional expertise, training, and discretion also show California played at most

8   a minor role in Kaiser's and Dr. Myette's actions.  CUDDA describes brain death in general

9   terms—the "irreversible cessation of all functions of the entire brain, including the brain stem"—

10  and it specifically refers to "accepted medical standards."  *See* Cal. Health & Safety Code § 7180.

11  California has not dictated which tests must be performed, how, when, or by whom.  These

12  specifics are all matters of private medical expertise and discretion.  They are the subject of

13  guidelines published by professional medical organizations.  *See, e.g.*, Am. Acad. Pediatrics,

14  *Clinical Report—Guidelines for the Determination of Brain Death in Infants and Children*

15  (2011), ECF No. 36-1.  The determination of Israel's brain death "ultimately turn[ed] on medical

16  judgments made by private parties according to professional standards" that California did not

17  establish.  *Blum*, 457 U.S. at 1008.

18           Upon close review, this case contrasts with the others in which doctors and

19  hospitals have been found to act under color of law.  For example, drawing from those cited

20  above, in *West v. Atkins*, the Supreme Court held that a doctor employed part-time by the state

21  acted under color of law when he treated inmates in a state prison.  *See generally* 487 U.S. 42.  In

22  *Chudacoff v. University Medical Center of South Nevada*, the Ninth Circuit described the

23  defendant hospital as public "through and through," because it was "controlled and managed" by

24  the state and the defendants' authority "flow[ed] directly from the state."  649 F.3d at 1150.

25           This case also contrasts with the general body of decisions based on action under

26  color of law that occurred outside the hospital context.  In the *Lugar* case on which plaintiff has

27  relied, for example, the Supreme Court considered whether a private defendant who used an *ex*

28  *parte* state procedure to obtain an order sequestering the plaintiff's property could be liable as a

14

state actor. 457 U.S. at 924–25.  The Court reaffirmed that a private person could be held liable as a state actor in that situation, noting that the state's involvement was "overt" and "official" and that the private person participated jointly with the state in a seizure of property. *Id.* at 927–28, 941; *see also Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 290–91 (2001) ("[T]he association in question here includes most public schools located within the State, acts through their representatives, draws its officers from them, is largely funded by their dues and income received in their stead, and has historically been seen to regulate in lieu of the State Board of Education's exercise of its own authority.").

Ms. Fonseca has not cited any case where a private doctor working at a private hospital providing treatment to a private person was found to have acted under color of law.  The court's independent research has likewise produced no example.  This is a case of private action, not public action.  The § 1983 claims against Kaiser and Dr. Myette cannot support Ms. Fonseca's request for a preliminary injunction.

In determining whether an injunction should issue, therefore, the court considers only the EMTALA claim against Kaiser, which appears to be the claim on which plaintiff primarily relies, as well as the § 1983 claims against Dr. Smith.

III.    LEGAL STANDARD

A preliminary injunction preserves the relative position of the parties until a trial is completed on the merits or the case is otherwise concluded. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  It is an extraordinary remedy awarded only upon a clear showing that the plaintiff is entitled to relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The plaintiff must show she is "likely to succeed on the merits," "likely to suffer irreparable harm in the absence of the preliminary relief," "the balance of equities tips in [her] favor," and "an injunction is in the public interest." *Id.* at 20.  Alternatively, if a plaintiff cannot demonstrate she is likely to succeed on the merits of her claims, but can show at least (1) that "serious questions" go to the merits of her claims, (2) that the "balance of hardships tips *sharply*" in her favor, and (3) that the other two parts of the *Winter* test are satisfied, then a preliminary injunction may be proper nonetheless. *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)

15

1    (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011))

2    (emphasis in *Shell*).

3            But if the plaintiff cannot show she has even a "fair chance of success on the

4    merits," then it does not matter how the other parts of the *Winter* test may be resolved; "at an

5    irreducible minimum the moving party must demonstrate a fair chance of success on the merits,

6    or questions serious enough to require litigation." *Pimentel v. Dreyfus*, 670 F.3d 1096, 1111 (9th

7    Cir. 2012) (quoting *Guzman v. Shewry*, 552 F.3d 941, 948 (9th Cir. 2009)) (internal quotation

8    marks omitted).

9            When deciding whether to issue a preliminary injunction, the court may rely on

10   declarations, affidavits, and exhibits, among other things, and this evidence need not conform to

11   the standards that apply at summary judgment or trial. *Johnson v. Couturier*, 572 F.3d 1067,

12   1083 (9th Cir. 2009); *see also Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984)

13   ("The trial court may give even inadmissible evidence some weight, when to do so serves the

14   purpose of preventing irreparable harm before trial"); *Rubin* ex rel. *N.L.R.B. v. Vista Del Sol*

15   *Health Servs., Inc.*, 80 F. Supp. 3d 1058, 1072 (C.D. Cal. 2015) ("It is well established that trial

16   courts can consider otherwise inadmissible evidence in deciding whether or not to issue a

17   preliminary injunction."). "A credibility determination is well within the court's province when

18   ruling on a preliminary injunction motion . . . ." *N.E. England Braiding Co. v. A.W. Chesterton*

19   *Co.*, 970 F.2d 878, 884 (Fed. Cir. 1992); *accord Oakland Tribune, Inc. v. Chronicle Pub. Co.,*

20   *Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985); 11A Charles A. Wright, et al., Federal Practice &

21   Procedure § 2949 (3d ed. 2013).  A district court may also hear oral testimony at a hearing.

22   *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1326 (9th Cir. 1994).  Oral testimony is unnecessary,

23   however, if the parties had an adequate opportunity to submit written testimony and argue the

24   matter. *Id.*

25   IV.    DISCUSSION

26          A.     EMTALA Claim Against Kaiser

27          Ms. Fonseca argues that under EMTALA, Kaiser is required to provide

28   "stabilizing treatment" to Israel until he can be transferred.  Mot. Prelim. Inj. at 10–11.  She relies

heavily on the Fourth Circuit's decision in *In re Baby K*, 16 F.3d 590 (4th Cir. 1994), discussed below.

Congress enacted EMTALA over concerns that "hospitals were dumping patients who were unable to pay for care, either by refusing to provide emergency treatment to these patients, or by transferring the patients to other hospitals before the patients' conditions stabilized." *Jackson v. East Bay Hosp.*, 246 F.3d 1248, 1254 (9th Cir. 2001); *see* H.R. Rep. No. 241, 99th Cong., 1st Sess., Part I, at 27 (1985), reprinted in 1986 U.S. Code Cong. & Admin. News 579, 605.  EMTALA provides,

> In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.

42 U.S.C. § 1395dd(a).

If the hospital determines that the individual has an emergency medical condition, then the hospital must provide either

> (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

> (B) for transfer of the individual to another medical facility . . . .

*Id.* § 1395dd(b).  An "emergency medical condition" is defined as

> a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—(i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part . . . .

*Id.* § 1395dd(e)(1)(A).  "To stabilize" and "stabilized" are also specifically defined:

> (A) The term "to stabilize" means, with respect to an emergency medical condition . . . , to provide such medical treatment of the

17

1          condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely
2          to result from or occur during the transfer of the individual from a facility . . . .

3

4          (B) The term "stabilized" means, with respect to an emergency medical condition . . . , that no material deterioration of the
5          condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility . . . .

6

7  *Id.* § 1395dd(e)(3).

8         It appears there is no binding or persuasive authority on all fours with this case.

9  As noted, Ms. Fonseca analogizes her case to that of the child in *Baby K*.  Mot. Prelim. Inj. at 11.

10  The patient in *Baby K* was an anencephalic[5] infant suffering from respiratory distress.  16 F.3d at

11  592–93.  The hospital physicians informed Baby K's mother that most anencephalic infants die

12  within a few days of birth due to breathing difficulties and other complications, and

13  recommended that Baby K be provided only with supportive care in the form of nutrition,

14  hydration and warmth.  *Id.* at 592.  Baby K's mother and physicians were not able to reach an

15  agreement as to the appropriate care for Baby K; thus, Baby K's mother transferred her to a

16  nursing home.  *Id.* at 593.  After the transfer, Baby K was readmitted to the hospital three times

17  due to breathing difficulties.  *Id.*  Each time, after breathing assistance was provided and Baby K

18  was stabilized, she was discharged to the nursing home.  *Id.*  Following Baby K's second

19  admission, the hospital sought a declaratory judgment that it was not required to provide

20  respiratory support to anencephalic infants.  *Id.*  The district court denied that relief, and the

21  Fourth Circuit affirmed, observing:

22          Congress rejected a case-by-case approach to determining what emergency medical treatment hospitals and physicians must provide
23          and to whom they must provide it; instead, it required hospitals and physicians to provide stabilizing care to any individual presenting
24          an emergency medical condition.  EMTALA does not carve out an exception for anencephalic infants in respiratory distress any more

25  _____

26        [5] Anencephaly is a congenital malformation where a major portion of the patient's brain, skull and scalp are missing.  *Baby K*, 16 F.3d at 592.  The presence of a brain stem supported
27  Baby K's autonomic functions and reflex actions, but, without a cerebrum, the patient was permanently unconscious and had no cognitive abilities or awareness.  *Id.*  She could not see,
28  hear, or interact with her surroundings.  *Id.*

than it carves out an exception for comatose patients, those with lung cancer, or those with muscular dystrophy—all of whom may repeatedly seek emergency stabilizing treatment for respiratory distress and also possess an underlying medical condition that severely affects their quality of life and ultimately may result in their death.

*Id.* at 598. EMTALA was therefore applicable and required the hospital to provide stabilizing care to Baby K when her mother sought emergency care. *Id.*

Two years later, the Fourth Circuit clarified its holding in *Baby K* and provided a narrowed reading of EMTALA. *See Bryan v. Rectors and Visitors of the Univ. of Va.*, 95 F.3d 349, 352 (4th Cir. 1996). In *Bryan*, the plaintiff argued that the hospital defendant violated EMTALA when, after treating the adult patient for an emergency condition for twelve days, it decided that no further efforts to prevent the patient's death should be made. *Id.* at 350, 352. The hospital refused to follow instructions from the patient's husband and family, and entered a "do not resuscitate" order against the family's wishes. *Id.* at 350. As a result, the patient's condition worsened, and she died a few days later. The Fourth Circuit found EMTALA did not apply and distinguished *Baby K*:

Under the circumstances [in *Baby K*], the requirement was to provide stabilizing treatment of . . . respiratory distress, without regard to the fact that the patient was anencephalic or to the appropriate standards of care for that general condition.

The holding in *Baby K* thus turned entirely on the substantive nature of the stabilizing treatment that EMTALA required for a particular emergency medical condition. The case did not present the issue of the temporal duration of that obligation, and certainly did not hold that it was of indefinite duration.

*Id.* at 352. The *Bryan* court went on to affirm the district court's order dismissing the case because the plaintiff had conceded that the patient received stabilizing treatment in accordance with EMTALA for twelve days. *Id.* at 353. The plaintiff's claim rested only on the "ultimate cessation of that or any further medical treatment upon entry of the anti-resuscitation order," which did not violate EMTALA. *Id.*

The Fourth Circuit further noted that EMTALA is "a limited 'anti-dumping' statute, not a federal malpractice statute." *Id.* at 351. It echoed the decisions of other circuit

19

1    courts, noting that EMTALA was enacted to prevent patients from being turned away from

2    emergency rooms for lack of insurance or other non-medical reasons.  *Id.*; *see also, e.g.*, *Phillips*

3    *v. Hillcrest Med. Ctr.*, 244 F.3d 790, 796 (10th Cir. 2001) (Congress enacted EMTALA to

4    regulate emergency room care to prevent the dumping" of the uninsured); *Cherukuri v. Shalala*,

5    175 F.3d 446, 448 (6th Cir. 1999) (same).  The Ninth Circuit, in finding EMTALA provides no

6    private right of action against physicians, has characterized the law's purpose in the same way:

7    "Congress enacted [EMTALA] in response to a growing concern about the provision of adequate

8    emergency room medical services to individuals who seek care, particularly as to the indigent and

9    uninsured."  *Eberhardt v. City of L.A.*, 62 F.3d 1253, 1255 (9th Cir. 1995) (citation and quotation

10   marks omitted).  "Congress was concerned that hospitals were 'dumping' patients who were

11   unable to pay, by either refusing to provide emergency medical treatment or transferring patients

12   before their conditions were stabilized."  *Id.*

13          Ultimately, the Fourth Circuit held in *Bryan* that once stabilizing treatment has

14   been provided for a patient who arrives with an emergency condition, "the patient's care becomes

15   the legal responsibility of the hospital and the treating physicians," and the legal adequacy of the

16   subsequent care is no longer governed by EMTALA.  95 F.3d at 351.  A hospital is not obligated

17   to provide "stabilizing treatment" for a particular "emergency medical condition" for an indefinite

18   duration, at least in terms of its liability under EMTALA.  *See id.* at 352.

19          Here, after Israel's first admission to a local hospital for an asthma attack, then his

20   loss of consciousness, intubation and transfer to U.C. Davis, followed by a brain death

21   examination and apnea tests[6] at U.C. Davis, Israel was transferred to Kaiser on the eleventh day

22   after his asthma attack.  At Kaiser, stabilizing treatment was provided, another apnea test was

23   performed, and after another three days, two doctors performed tests independently to determine

24   whether Israel's brain was still functioning.  Each doctor determined Israel had suffered brain

25

26          _____

27          [6] In performing an apnea test, a doctor removes the ventilator and allows the carbon
     dioxide levels within a patient to rise in order to provoke a respiratory response.  The First
     Amended Complaint appears to allege that Israel was not comatose at the time of this testing, but
28   does not provide further clarification as to his actual state.  FAC ¶ 19.

1   death as provided by CUDDA on April 14, 2016.[7]  Kaiser completed a portion of a Certificate of

2   Death for Israel soon afterward.  ECF No. 43-3.  Nonetheless, Kaiser has continued to provide

3   support for Israel pending the parties' efforts at mediation and court decisions.

4          As a practical matter, after stabilizing Israel, Kaiser determined Israel's condition

5   was no longer an emergency medical condition because it found Israel had suffered brain death.

6   This determination distinguishes this case from *Baby K*, where the patient, despite breathing

7   difficulties, was stabilized and discharged.  Also, unlike *Baby K*, this is not a case where the

8   patient still "seek[s] emergency stabilizing treatment for [medical] distress."  *Baby K*, 16 F.3d at

9   598.  Rather, Ms. Fonseca requests that Israel remain on a ventilator with additional treatment so

10  he can be in his current condition once she has a plan for transfer.  The dispute here, as in *Bryan*,

11  raises at best a question of long-term care.  *See id.*  EMTALA does not obligate Kaiser to

12  maintain Israel on life support indefinitely.  Plaintiff identifies no date by which she would agree

13  Kaiser's obligations cease.  This case raises no serious questions under EMTALA.

14         B.     Substantive Due Process Claim Against Dr. Smith

15         The complaint alleges generally that CUDDA deprives Ms. Fonseca of liberty and

16  privacy and Israel of life without due process.  *See* First Am. Compl. at 11–15.  In her moving

17  papers, Ms. Fonseca clarifies that she challenges CUDDA both as a matter of substance and with

18  respect to the procedures CUDDA establishes.  *See* Mot. Prelim. Inj. at 11–12.  The court

19  considers first, here, her substantive challenge.  As explained below, the court does not enjoin

20  CUDDA, and therefore does not provide Dr. Smith time to brief her position on plaintiff's claims

21  against her.

22         The Due Process Clause of the Fourteenth Amendment prohibits states from

23  making or enforcing laws that deprive a person of life, liberty, or property without due process.

24  U.S. Const. amend. XIV, § 1.  The Clause has been construed to "protect[] individual liberty

25  against certain government actions regardless of the fairness of the procedures used to implement

26  them."  *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992) (citation and quotation

27
         [7] As the state court found, Kaiser thus provided the "independent confirmation" required
28  by CUDDA.  Cal. Health & Safety Code § 7181.

marks omitted).  It "provides heightened protection against government interference with certain fundamental rights and liberty interests."  *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). Among these rights is a person's liberty interest in making certain decisions about medical treatment.  *See id.* at 724–25 (citing *Cruzan by Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 279 (1990)).

### 1.   Rights at Stake

When presented with a due process challenge, the court must take care to understand what right or liberty interest is at stake.  *See id.* at 721 (referring to a "careful description" of the asserted fundamental liberty interest).  Ms. Fonseca would define the interests in question here as Israel's right to live and her right to make decisions about his care; that is, she alleges CUDDA deprives her of a right to make healthcare decisions for Israel.  *See* Mot. Prelim. Inj. at 11–16.  For all practical purposes, these claims are the same: they are both challenges to California's decision to place brain death on equal footing with the prior legal understanding of death, as linked to breath and heartbeat.  Although the court agrees Ms. Fonseca has a fundamental liberty interest "in the care, custody, and control of [her] children," *Troxel v. Granville*, 530 U.S. 57, 65 (2000), it does not follow that any person, parent or not, has a right to demand healthcare be administered to those who are not alive in the eyes of the state. Nevertheless, Ms. Fonseca's fundamental interests in the care of her son likely encompass her challenge to California's determination that he is not alive.  For purposes of this motion, the court finds Ms. Fonseca may challenge CUDDA in her own right as well as on Israel's behalf.  *But see Pickup v. Brown*, 740 F.3d 1208, 1235–36 (9th Cir.) (finding a parent has no fundamental right "to choose for a child a particular type of provider for a particular treatment that the state has deemed harmful"), *cert. denied*, 134 S. Ct. 2871, *and cert. denied sub nom. Welch v. Brown*, 134 S. Ct. 2881 (2014).

It goes without saying that the right to life is fundamental.  The fundamental rights of parents have also been unquestioned for the better part of a century at least.  *See, e.g., Troxel*, 530 U.S. at 65.  This does not end this court's inquiry; whether a constitutional right has been violated is determined by balancing that right or liberty interest against the "relevant state

interests." *Cruzan*, 497 U.S. at 279 (quoting *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982)). In other words, "[i]n determining whether a substantive right protected by the Due Process Clause has been violated, it is necessary to balance the liberty of the individual and the demands of an organized society." *Youngberg*, 456 U.S. at 320 (citation and quotation marks omitted).

2.   Balancing of Interests

The particulars of the required balancing exercise are difficult to describe generally. The Supreme Court has engaged in balancing in three cases that are instructive here. In *Cruzan*, the Court balanced a competent person's "constitutionally protected liberty interest in refusing unwanted medical treatment" against Missouri's decision to require clear and convincing evidence that a person in a persistent vegetative state would have wanted to terminate treatment. 497 U.S. at 278–85. The Court considered the State's interests in safeguarding the deeply personal choice between life and death. *See id.* at 281. In *Youngberg*, the Court balanced a civilly committed person's interests in safety and freedom against the state's interests, for example in protecting others from violence, and concluded that the state was constitutionally required to ensure that the commitment decision was not made in reliance on a "substantial departure from accepted professional judgment, practice, or standards." 457 U.S. at 321–23. And in *Bell v. Wolfish*, 441 U.S. 520 (1979), the Court balanced the rights of pretrial detainees to be free from punishment against the state's interest in ensuring a defendant is present at trial, the state's "operational concerns," and other related interests. *Id.* at 539–40. Similarly, as the Ninth Circuit has observed, a parent's fundamental liberty interest in maintaining the family relationship is not absolute; when the state interferes with that relationship, the parents' interests must be balanced against those of the state. *See, e.g.*, *Woodrum v. Woodward Cty., Okl.*, 866 F.2d 1121, 1125 (9th Cir. 1989); *see also Pickup*, 740 F.3d at 1235 ("Parents have a constitutionally protected right to make decisions regarding the care, custody, and control of their children, but that right is not without limitations." (citation and quotation marks omitted)).

While the historical, common-law understanding, that death occurred after the permanent cessation of breath and blood flow, was generally in effect in this country for many years prior to the late 1900s, *see, e.g.*, *People v. Mitchell*, 132 Cal. App. 3d 389, 396–97 (1982)

1   (citing *Commonwealth v. Golston*, 373 Mass. 249 (1977)), the understanding of the human body's

2   functioning is different today than it was when death was defined without reference to the brain.

3   The previous legal understanding of death fit within a context when the heart, lungs, and other

4   organs could not be sustained artificially.  In the face of changing technology, California has a

5   broad range of legitimate interests in drawing boundaries between life and that reflect current

6   understanding.  These interests include: for purposes of criminal law (has a murder occurred and

7   when?), tort liability (has a doctor caused a death and when?), probate and the law of estates

8   (what rights do heirs possess and when?), general healthcare and bioethics (how must the state

9   and private medical providers allocate scarce resources among the ill and injured?), and as

10  relevant here regulation of the medical profession (when may a doctor refuse treatment, and when

11  must a doctor provide treatment?).  *Cf. Glucksberg*, 521 U.S. at 731 (recognizing a state's interest

12  in protecting "the integrity and ethics of the medical profession" opposite an asserted fundamental

13  right); *Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975) ("States have a compelling interest in

14  the practice of professions within their boundaries . . . ."); *Varandani v. Bowen*, 824 F.2d 307,

15  311 (4th Cir. 1987) (recognizing a state's "compelling interest in assuring safe health care for the

16  public").

17          Nothing before the court suggests CUDDA is arbitrary, unreasoned, or

18  unsupported by medical science.  Kansas was the first to adopt a statutory definition of death in

19  1970, including brain death.  *See State v. Shaffer*, 223 Kan. 244, 249 (1977).  Other states

20  followed this lead, and the Uniform Determination of Death Act was adopted in 1980 by the

21  National Conference of Commissions on Uniform Laws.  David B. Sweet, *Homicide by Causing*

22  *Victim's Brain-Dead Condition*, 42 A.L.R.4th 742 (orig. pub. 1985).  The current version of the

23  Act is the product of a long-debated agreement between the American Medical Association and

24  the American Bar Association.  *See id.*; 14 Witkin, Summary 10th, Wills, § 11, p. 69 (2005).

25  Thirty-three states and the District of Columbia have formally adopted the Act.  *See* U.L.A., Unif.

26  Determination of Death Act, Refs. & Annos.; *see also In re Guardianship of Hailu*, 361 P.3d 524,

27  528 (Nev. 2015) ("The UDDA and similar brain death definitions have been uniformly accepted

28  throughout the country.").  California adopted the Act in 1982.  *See* 1982 Cal. Stat. 3098.

1    Brain death itself is a widely recognized and accepted phenomenon, including in

2  children and infants.  *See, e.g.*, Am. Acad. Pediatrics, *Clinical Report—Guidelines for the*

3  *Determination of Brain Death in Infants and Children* (2011), ECF No. 36-1 (affirming "the

4  definition of death," the same definition used in CUDDA, which "had been established by

5  multiple organizations including the American Medical Association, the American Bar

6  Association, the National Conference of Commissioners on Uniform State Laws, the President's

7  Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral

8  Research and the American Academy of Neurology"); James L. Bernat, *The Whole-Brain*

9  *Concept of Death Remains Optimum Public Policy*, 34 J.L. Med. & Ethics 35, 36 (2006) ("The

10  practice of determining human death using brain tests has become worldwide over the past

11  several decades.  The practice is enshrined in law in all 50 states in the United States and in

12  approximately 80 other countries . . . .").

13    At the same time, the court recognizes the unease with which some regard brain

14  death.  *See, e.g.*, Bernat, *supra*, at 36 (referring to a "persistent group of critics"); Seema K. Shah,

15  *Piercing the Veil: The Limits of Brain Death as a Legal Fiction*, 48 U. Mich. J. L. Reform 301,

16  302 (2015) (recognizing the "tremendous value of the legal standard of brain death in some

17  contexts" but arguing brain death is a legal fiction and should not be recognized in certain cases,

18  including where religious and moral objections are raised); D. Alan Shewmon, *"Brainstem*

19  *Death," "Brain Death" and "Death": A Critical Re-Evaluation of the Purported Equivalence*,

20  14 Iss. L. & Med. 125 (1998) (advocating for a definition of death that looks to more than the

21  brain).  A California Court of Appeal has suggested "[p]arents do not lose all control once their

22  child is determined brain dead," but also expressed uncertainty whether this right was born of the

23  common law, the Constitution, logic, or simple decency.  *Dority v. Superior Court*, 145 Cal. App.

24  3d 273, 279–80 (1983).  Ms. Fonseca has presented the declaration of Dr. Paul Byrne, M.D., who

25  believes Israel may recover some cognitive function with time and treatment.  *See generally*

26  Byrne Decl., ECF No. 36.  Dr. Myette disagrees.  *See* Myette Decl. ¶ 15.  On balance, a

27  professional doubt surrounding brain death as death, legally or medically, represents a minority

28  position.  Such doubt is unlikely to render CUDDA substantively unconstitutional on its face.

1     C.     Procedural Due Process Claim against Dr. Smith

2          "A procedural due process claim has two elements: deprivation of a

3     constitutionally protected liberty or property interest and denial of adequate procedural

4     protection." *Krainski v. Nev.* ex rel. *Bd. of Regents of Nev. Sys. of Higher Educ.*, 616 F.3d 963,

5     970 (9th Cir. 2010).  Here, as discussed, California is alleged to have deprived Israel of life and

6     Ms. Fonseca of her fundamental interests in the care, custody, and control of her children.  These

7     are fundamental rights and interests the Constitution protects.  Ms. Fonseca still must demonstrate

8     she is likely to succeed in showing the process provided to Israel and herself has been inadequate.

9          "Due process, unlike some legal rules, is not a technical conception with a fixed

10    content unrelated to time, place and circumstances.  It is compounded of history, reason, the past

11    course of decisions." *Cafeteria & Rest. Workers Union v. McElroy*, 367 U.S. 886, 895 (1961)

12    (citation, alteration, and quotation marks omitted).  "The fundamental requirement of due process

13    is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v.*

14    *Eldridge*, 424 U.S. 319, 333 (1976) (citation and quotation marks omitted).  What process is due

15    generally depends on three factors: (1) "the private interest that will be affected by the official

16    action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used,

17    and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the

18    Government's interest, including the function involved and the fiscal and administrative burdens

19    that the additional or substitute procedural requirement would entail." *Id.* at 335.

20         CUDDA and other provisions of the Health and Safety Code provide several

21    procedural safeguards:

22         (1) Health & Safety Code section 7180 allows a determination of death only "in

23    accordance with accepted medical standards."

24         (2) "When an individual is pronounced dead by determining that the individual has

25    sustained an irreversible cessation of all functions of the entire brain, including the brain stem,

26    there shall be independent confirmation by another physician."  Cal. Health & Safety Code

27    § 7181.

28

26

(3) Physicians involved in the determination of death must not participate in any procedures to remove or transplant the deceased person's organs. *Id.* § 7182.

(4) "Complete patient medical records required of a health facility pursuant to regulations adopted by the department in accordance with [California Health and Safety Code] Section 1275 shall be kept, maintained, and preserved" with respect to CUDDA's requirements in the case of a brain death. *Id.* § 7183.

(5) Hospitals must "adopt a policy for providing family or next of kin with a reasonably brief period of accommodation . . . from the time that a patient is declared dead by reason of irreversible cessation of all functions of the entire brain, including the brain stem . . . through discontinuation of cardiopulmonary support for the patient. During this reasonably brief period of accommodation, a hospital is required to continue only previously ordered cardiopulmonary support. No other medical intervention is required." *Id.* § 1254.4(a). "[A] 'reasonably brief period' means an amount of time afforded to gather family or next of kin at the patient's bedside." *Id.* § 1254.4(b). "[I]n determining what is reasonable, a hospital shall consider the needs of other patients and prospective patients in urgent need of care." *Id.* § 1254.4(d).

(6) The hospital must "provide the patient's . . . family or next of kin, if available, with a written statement of the [policy regarding a reasonably brief period of accommodation described in section 1254.4(a)], upon request, but no later than shortly after the treating physician has determined that the potential for brain death is imminent." *Id.* § 1254.4(c)(1). "If the patient's . . . family . . . voices any special religious or cultural practices and concerns of the patient or the patient's family surrounding the issue of death by reason of irreversible cessation of all functions of the entire brain of the patient, the hospital shall make reasonable efforts to accommodate those religious and cultural practices and concerns." *Id.* § 1254.4(c)(2).

(7) Section 1254.4 provides for no private right of action, as plaintiff stresses. *Id.* § 1254.4(e). But a state court may hear evidence and review a physician's determination that brain death has occurred. *See Dority*, 145 Cal. App. 3d at 280 ("The [trial] court, after hearing the medical evidence and taking into consideration the rights of all the parties involved, found

27

1  [the patient] was dead in accordance with the California statutes and ordered withdrawal of the

2  life-support device.  The court's order was proper and appropriate.").

3         Ms. Fonseca is unlikely to show the available protections are inadequate.  Whether

4  a person has suffered brain death is a medical determination that should involve a doctor, as

5  CUDDA foresees.  CUDDA creates a procedure that allows a determination to be verified

6  quickly; false positives may mean a patient in critical condition receives no care.  The law

7  requires an independent confirmation of death in the case of suspected brain death; here at least

8  three doctors have independently determined Israel is brain dead.  Doctors who make the

9  determination of death cannot be involved in any related transplant procedures; here the doctors

10  are not.  Family may gather at a patient's bedside, and hospitals must make reasonable

11  accommodations for the religious or moral concerns of the patient's family or next of kin.  The

12  family has been provided more than a brief period of time to gather, and the state court

13  considered and addressed Ms. Fonseca's moral and religious concerns during the time its TRO

14  was in effect.

15         In addition, although section 1254.4 creates no private right of action, a California

16  appellate court has determined that an interested person has some recourse to judicial review.

17  Ms. Fonseca sought and received immediate protection from the Placer County Superior Court,

18  which entered a TRO and allowed her to present evidence and seek relief over the course of two

19  weeks.  Although Ms. Fonseca has not appealed the state court's dismissal of her case, *Dority*

20  signals she could.  At hearing, her counsel in this case -- who is not counsel in her state case –

21  suggested that a state appeal would be burdensome or unproductive, and exclaimed that taking

22  that route generally is a "death knell for California working class families."  While the full impact

23  of his statement is not clear to this court, nothing in the record before it supports the conclusion

24  that full procedural due process is unavailable with respect to CUDDA.

25  V.     RELIEF SOUGHT

26         Ms. Fonseca has not borne her burden to show she is likely to succeed on the

27  merits of the claims she relies on at this stage, and she has not presented sufficiently serious

28

1    questions to justify a preliminary injunction.  This conclusion is bolstered by the fact that her

2    claims do not appear to fit with the relief she seeks.

3            While Ms. Fonseca requests maintenance of ventilation, she also requests a

4    mandatory injunction.  *See* First Am. Compl. ¶¶ 48 (requesting an injunction that requires Kaiser

5    to provide nutrition to Israel); Proposed Order, ECF No. 33-1 at 3.  A mandatory injunction

6    "orders a responsible party to take action."  *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir.

7    2015) (citation and quotation marks omitted).  This type of relief "goes well beyond simply

8    maintaining the *status quo pendente lite* and is particularly disfavored."  *Id.* (citation, quotation

9    marks, and alterations omitted).  Mandatory injunctions are incompatible with doubtful cases like

10   this one.  *Id.*  Moreover, it seems unlikely this court would have jurisdiction to consider the

11   specifics of what care Israel must receive.  This question, among others, was the subject of the

12   Placer County Superior Court's orders and hearings last month.  The *Rooker-Feldman* doctrine or

13   standard preclusion rules would likely apply.  *See, e.g.*, *Cooper*, 704 F.3d at 777; *cf. Exxon Mobil*

14   *Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284, 292–94 (2005) (referring to independent

15   doctrines of preclusion, stay, and dismissal that may arise in the presence of parallel state court

16   proceedings).

17          As noted, it appears the court lacks subject matter jurisdiction over the § 1983

18   claims against Kaiser and Dr. Myette, and EMTALA does not provide a basis for enjoining

19   Kaiser on the facts here.  Dr. Smith may be the only viable defendant in this action.  An order

20   requiring Kaiser to maintain Israel's condition could not properly be issued against Dr. Smith.  If

21   indeed CUDDA is facially unconstitutional, the court could at most declare that the certificate of

22   Israel's death is void.  Kaiser and its physicians would then remain subject to other provisions of

23   California law that are not before this court.  *See, e.g.*, Cal. Prob. Code §§ 4735 ("A health care

24   provider or health care institution may decline to comply with an individual health care

25   instruction or health care decision that requires medically ineffective health care or health care

26   contrary to generally accepted health care standards applicable to the health care provider or

27   institution."); *id.* § 4654 ("[Division 4.7 of the Probate Code] does not authorize or require a

28

1   health care provider or health care institution to provide health care contrary to generally accepted

2   health care standards applicable to the health care provider or health care institution.").

3          While Ms. Fonseca's maternal instincts and moral position are completely

4   understandable, the concerns reviewed here suggest she is unlikely to obtain the relief she seeks,

5   and weigh against a preliminary injunction based on the law this court is sworn to apply and

6   uphold.

7   VI.     CONTINUING TEMPORARY RELIEF

8          To date, the TRO the court previously issued has remained in effect.  *See* Order

9   Apr. 28, 2016, ECF No. 9; Minutes, ECF No. 22; Minutes, ECF No. 45.  At the May 11, 2016

10  hearing, Ms. Fonseca indicated she would ask the court stay the effect of an order denying her

11  request for a preliminary injunction to allow her to seek emergency relief from the Ninth Circuit

12  Court of Appeals.  The defendants expressed no objection to this request.

13         "While an appeal is pending from an interlocutory order . . . that . . . denies an

14  injunction, the court may . . . grant an injunction on terms for bond or other terms that secure the

15  opposing party's rights."  Fed. R. Civ. P. 62(c).  Under this rule, the court considers generally the

16  same factors as in the context of a temporary restraining order or preliminary injunction.  *See,*

17  *e.g.*, *Protect Our Water v. Flowers*, 377 F. Supp. 2d 882, 883 (E.D. Cal. 2004).  Nevertheless,

18  when a court has attempted to answer a question of first impression, and when the practical

19  consequences of its decision suggest caution, a plaintiff's likely success on the merits may not

20  play so central a role.  *See, e.g.*, *id.*; *Yamada v. Kuramoto*, 744 F. Supp. 2d 1075, 1087 (D. Haw.

21  2010).  And in a case such as this one, "[a]n erroneous decision. . . is not susceptible of

22  correction."  *Cruzan*, 497 U.S. at 283.

23         The court therefore provides that this order will not take effect, and the temporary

24  restraining order will remain in place, until the close of business on Friday, May 20, 2016, to

25  allow Ms. Fonseca time to seek emergency relief from the Ninth Circuit Court of Appeals.

26  /////

27  /////

28  /////

30

VII.    <u>CONCLUSION</u>

  The temporary restraining order currently in effect REMAINS IN PLACE until the close of business on Friday, May 20, 2016, at which point it will be dissolved.  The motion for a preliminary injunction is DENIED.

  This order resolves ECF Nos. 31 & 33.

  IT IS SO ORDERED.

DATED:  May 13, 2016.


_____
UNITED STATES DISTRICT JUDGE

31